**George H. NIX, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 91–270.

United States Court of Veterans Appeals.

April 5, 1993.

Before IVERS, Associate Judge.█

**MEMORANDUM DECISION**

IVERS, Associate Judge:

George H. Nix appeals a November 20, 1990, decision of the Board of Veterans' Appeals (BVA or Board) which denied his claims for service connection for an eye disorder, a back disorder, a chronic bilateral foot disorder, and a stomach disorder. The Secretary of Veterans Affairs (Secretary) filed a motion for summary affirmance. The Court has jurisdiction of the case under 38 U.S.C.A. § 7252(a) (West 1991). Because the veteran claimed service connection for an eye condition as a residual of radiation exposure during military service, the Court, on August 31, 1992, ordered proceedings in this appeal stayed

pending its decision in *Combee v. Principi,* 4 Vet.App. 78 (1993).

The veteran served in the United States Army from November 1944 to October 1946. R. at 1. His service medical records (SMRs) show that he had injured his sacrococcygeal region at age fourteen when he was thrown by a mule. R. at 17. Sacrococcygeal means "of, relating to, affecting, or performed by way of the region of the sacrum and coccyx." WEBSTER'S MEDICAL DESK DICTIONARY 629 (1986) [hereinafter WEBSTER'S]. The sacrum is "the part of the spinal column that is directly connected with or forms a part of the pelvis by articulation with the ilia and that in man forms the dorsal wall of the pelvis and consists of five united vertebrae diminishing in size to the apex at the lower end which bears the coccyx." *Id.* at 630. The coccyx is "the end of the spinal column beyond the sacrum." *Id.* at 130. The veteran's November 1944 induction examination report reveals an "old injury lower back" under "[m]usculoskeletal defects." R. at 4. Under "[m]usculoskeletal defects" on his separation examination, "[a]rthralgia knees" was noted as having existed prior to service. R. at 6. In addition, the words "[n]o disability" were written under "[m]usculoskeletal defects" on the separation examination report. *Id.*

The veteran's SMRs also reflect that in February 1945 he complained of "painful feet" which he stated developed without injury three weeks previously while on a 17–mile hike. R. at 17–18. 20–21. He was diagnosed with "pes cavus, right and left, cause undetermined, moderately severe." R. at 15, 21, 31–32. Pes cavus is "a foot deformity characterized by an abnormally high arch." WEBSTER'S at 534. It was determined that this disorder had existed prior to service. R. at 31. The veteran was also diagnosed during service with "metatarsalgia, r[igh]t foot." R. at 24–25. Metatarsalgia is "a cramping burning pain below and between the metatarsal bones where they join the toe bones." WEBSTER'S at 430. An x ray of the right and left feet taken in February 1945 was negative. R. at 25. In April 1945, another physical examination revealed "pes cavus metatarsal-

gia," and the veteran was referred to an orthopedic clinic for a possible shoe correction. R. at 32. No abnormalities of the feet were noted on the separation examination report. R. at 6.

The veteran's SMRs show that he suffered from enteritis in July 1945, at which time he experienced a severe headache and blurring vision for one day. R. at 10–11. Enteritis is "inflammation of the intestines and esp[ecially] of the human ileum." WEBSTER'S at 213. His separation examination report did not reflect enteritis or any other abnormality pertaining to the stomach or intestines. R. at 35. A rating decision document, dated November 26, 1946, reflects that "enteritis, acute, catarrhal, not found on last examination." R. at 36. No eye abnormalities were noted on the veteran's separation examination report. R. at 6.

For the sake of clarity, the Court's review of the BVA decision on each of the four claims is set out separately below.

### A. Eye Disorder

A hospital summary, showing a period of hospitalization from October 26, 1981, to October 31, 1981, at a Veterans' Administration (now Department of Veterans Affairs) (V.A) medical center (VAMC), shows that the veteran was hospitalized for, inter alia, "squamous papilloma of the right upper eyelid" and "vitreous float[er]." R. at 38. Papilloma is "a benign tumor ..." (WEBSTER'S at 513) and squamous means "covered with or consisting of scales." *Id.* at 672. A vitreous floater is "a bit of optical debris (as a dead cell or cell fragment) in the vitreous humor or lens that may be perceived as a spot before the eye." *Id.* at 246. The vitreous humor is "the clear colorless transparent jelly that fills the eyeball posterior to the lens...." *Id.* at 762. While hospitalized, the veteran's papilloma was excised from his eyelid. R. at 38. In 1982, the VA received a letter, dated March 29, 1982, from Roger M. Rossomondo, M.D., a private physician, who stated, inter alia, "Mr. Nix has a small refractive error and the appropriate prescription was given to him. The patient

has a history of floaters, but no floaters could be found. The gentleman's eyes are basically in good health." R. at 51.

A VA Medical Certificate dated January 17, 1984, reflects that the veteran complained of "floaters in eyes" and was diagnosed with "amaurosis [with history of cerebrovascular accident and] vitreous floaters." R. at 53–54. Amaurosis is "partial or complete loss of sight occurring without externally perceptible change in the eye." WEBSTER's at 25. The veteran complained of visual disturbances since 1964, but one examining physician stated that the "size [of the floater] is [not] great enough to explain his symptoms." R. at 55. A neurologist ruled out transient ischemic attack as the cause of the veteran's vision problems. R. at 56.

In June 1985, the veteran requested a VA medical examination to evaluate him for permanent and total disability for pension purposes. R. at 66. Among the ailments he claimed caused him to be permanently and totally disabled was "defective vision." *Id.* A medical record progress note, dated July 11, 1985, states, "H[istory] of gradual painless loss of vision ... since 1964." R. at 69. On July 18, 1985, the veteran was admitted to the VAMC, Tuskegee, Alabama, complaining of dizziness. R. at 80. He was discharged on August 2, 1985, and his discharge summary contains the following notation about his eyes:

> [W]ith reference to his history of decreased vision, consultation with the staff ophthalmologist was obtained. His refraction was 20/300. It was the opinion of the staff ophthalmologist that they could not determine the exact cause of why this patient had a refraction of 20/300 and that the patient will be followed in the Eye Clinic.

R. at 82. On August 6, 1985, a VA regional office (RO) rating board rated the veteran's decreased vision at 90% and granted a permanent and total disability rating for pension purposes. R. at 83.

In June 1987, the veteran requested a physical examination for the purpose of determining whether he was qualified to receive special monthly pension benefits.

R. at 122. A physician who examined the veteran's eyes pursuant to this request made the following notation under "Diagnosis" on an examination form: "1) [Decreased visual acuity]—unclear etiology—possibly radiation related but would expect optic nerve [illegible]. 2) No diabetic retinopathy seen." R. at 125.

On July 17, 1987, the RO received VA Form 21-2545, Report for Medical Examination for Disability Evaluation, on which the veteran stated, "Loss of eyesight—started in 1964—continued to get much worse. Have been advised that this was caused by radiation at Hiroshima." R. at 136. On July 27, 1987, the RO received VA Form 21-4138, Statement in Support of Claim, on which the veteran stated, inter alia, "I have been advised to file for the effects due to radiation on my eyes. In less than three months after the bomb was dropped on Hiroshima, I made three different trips into the area." R. at 149. An RO rating board denied the veteran's claim for service connection on August 17, 1987 (R. at 147–48), and notified him of that decision by letter dated September 3, 1987. R. at 146. In the notification letter, the VA stated with regard to the claim for service connection for the eye disorder, "[T]he evidence does not show any relationship between your decreased visual acuity and radiation exposure[,] and ... you do not have a radiogenic disease." R. at 146.

A few months later, the veteran submitted a VA Form 21-4138, Statement in Support of Claim, dated February 2, 1988, in which he stated, inter alia,

> I started having problems with my eyes ... on active duty, and as a result of the radiation from the bombs in Japan, I am now completely blind in one eye, with impaired vision in the other. Please also include this problem with my request for service connect[ion].

R. at 191.

On March 11, 1988, an RO rating board issued a rating decision, denying, inter alia, the veteran's claim for service connection for an eye condition. R. at 193–94. On December 28, 1988, the VA received from the veteran a VA Form 21-4138, Statement

in Support of Claim, which the VA accepted as a Notice of Disagreement with the March 11, 1988, rating decision. R. at 210, 215. A Statement of the Case, dated August 22, 1989, was sent to the veteran, and he submitted a VA Form 1–9 substantive appeal to the BVA dated August 31, 1989.

In denying his claim for service connection for an eye condition secondary to radiation exposure, the BVA stated, "None of the veteran's variously diagnosed eye disorders is a radiogenic disease as defined by the applicable law and regulations." *George H. Nix,* BVA 90–39841, at 5 (Nov. 20, 1990). In *Combee,* 4 Vet.App. 78, this Court considered "whether 38 U.S.C.A. § 1112 (West 1991) and 38 C.F.R. § 3.311b (1992), which provide presumptive service connection for a radiation-exposed veteran who manifests certain disabilities, preclude the establishment of direct service connection based on radiation exposure for diseases not enumerated in the referenced statute and regulation." *Id.,* at 80. In *Combee,* the Court held that

> [t]he VA's interpretation that the list of radiogenic diseases is exclusive, i.e., that a veteran can only establish service connection on a direct basis based on radiation exposure if the disability is enumerated in that list, is reasonable in light of the expressed goals of both the Senate and the House in enacting the Act to address the overwhelming medical and scientific uncertainty surrounding such claims and to promote uniformity and consistency in the adjudication of radiation exposure-based claims.

*Id.,* at 94.

■ This Court must affirm the factual findings of the BVA unless the determinations are "clearly erroneous." *Gilbert v. Derwinski,* 1 Vet.App. 49, 52–53 (1990). "[I]f there is a 'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, we cannot overturn them." *Id.* at 53. Upon review of the record in this case, the Court holds that the finding of the BVA that the veteran's eye disorder was not a radiogenic disease enumerated in either 38

U.S.C.A. § 1112 or 38 C.F.R. § 3.311b was not clearly erroneous. Furthermore, in light of the Court's holding in *Combee,* the BVA's conclusion that the veteran's "eye disorder may not be related to active service on the basis of exposure to ionizing radiation" was correct. *Nix,* BVA 90–39841, at 5.

## B. Back Disorder

■ The record reflects that several times in the 1980s the veteran complained of back pain (R. at 67, 196), but examinations did not reveal a back disorder. R. at 77, 133. With regard to the veteran's claim for service connection for a back disorder, the BVA noted that "[t]here is no clinical or other evidence on file that suggests a back ... disorder began during [the veteran's] period of active service." In addition, the Court observes that there is no evidence in the record of a current back disorder other than the veteran's own testimony that he suffers from back pain (R. at 236–37), and there is no medical evidence linking a current disorder, if any, to a disease or injury incurred in service. Accordingly, the Court holds that the BVA's conclusion that a back disorder was not incurred in or aggravated by active service is not clearly erroneous.

## C. Chronic Bilateral Foot Disorder

■ The record shows that since the mid–1980s the veteran complained often of "swelling feet" and other problems with his feet. R. at 67, 85, 89, 95–96, 100–01. In November 1985, a VA podiatrist's impression was "metatarsalgia—associated commonly with early diabetic neuropathy." R. at 86. Neuropathy is "an abnormal and usu[ally] degenerative state of the nervous system or nerves." WEBSTER'S at 474. The veteran was also diagnosed as having onychogryposis (R. at 87), which is "an abnormal condition of the nails characterized by marked hypertrophy and increased curvature" (*Id.* at 493), and arthritis of the feet. R. at 90, 102.

With regard to the veteran's claim for service connection for a chronic bilateral foot disorder, the Board cited relevant por-

tions of 38 C.F.R. § 3.303(b), the regulation describing "[c]hronicity and continuity," a principle relating to service connection which is relevant to this claim. The regulation provides, inter alia,

> Continuity of symptomatology is required ... where the condition noted during service is not, in fact, shown to be chronic.... *When the fact of chronicity in service is not adequately supported, then a showing of continuity after discharge is required to support the claim.*

38 C.F.R. § 3.303(b) (1991) (emphasis added). In this regard, the BVA noted,

> The veteran was hospitalized for bilateral foot pain during service, and a diagnosis of pes cavus was recorded at that time. However, the only post[-]service medical documentation on file pertaining to foot symptoms is dated approximately 40 years after service, and in reviewing these records, the Board finds no indication that the veteran's recent foot symptoms have been attributed to pes cavus.

*Nix*, BVA 90–39841, at 5. The Court observes that the record is equally devoid of evidence showing continuity of symptomatology for metatarsalgia. Accordingly, the Court holds that the BVA's conclusion that a chronic bilateral foot disorder was not incurred in or aggravated by active service is not clearly erroneous.

### D. Stomach Disorder

■ A hospital summary, showing a period of hospitalization from October 26, 1981, to October 31, 1981, at a VAMC, reflects that the veteran was hospitalized for, inter alia, gastric dyspepsia. R. at 38. The summary also shows that the veteran's "past history revealed having arthritis and taking [a]spirin twice a day." *Id.*

In June 1985, the veteran requested a VA medical examination to evaluate him for permanent and total disability for pension purposes. R. at 66. Among the ailments he claimed caused him to be permanently and totally disabled was a "stomach condition"; however, the record reflects that the veteran refused to undergo an "upper [gastrointestinal] series" and there-

fore the claimed stomach condition could not be fully evaluated. *Id.*

The record reflects other instances in the 1980s when the veteran complained of or sought treatment for stomach problems. R. at 67, 77, 91, 93, 133. However, there is no medical evidence of record linking current stomach pain or a current stomach disorder, if any, with an injury or disease incurred in service. Accordingly, the Court holds that the BVA's conclusion that a stomach disorder was not incurred in or aggravated by service is not clearly erroneous.

Upon consideration of the record, the Secretary's motion for summary affirmance, and appellant's brief, the Court holds that appellant has not demonstrated that the BVA committed either factual or legal error which would warrant reversal or remand. The Court is also satisfied that the BVA decision meets the "reasons or bases" requirements of 38 U.S.C.A. § 7104(d)(1) (West 1991) and that the Board did not err in applying the "benefit of the doubt" doctrine. 38 U.S.C.A. § 5107(b) (West 1991); *see Gilbert,* 1 Vet.App. at 53–58. It is further held that summary disposition is appropriate under *Frankel v. Derwinski,* 1 Vet.App. 23 (1990).

Therefore, the Secretary's motion for summary affirmance is granted and the November 20, 1990, decision of the BVA is AFFIRMED.